IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN COPFER, | ) | CASE NO.  1:18-cv-00001 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Brian Copfer ("Plaintiff" or "Copfer") seeks judicial review of the partially

favorable final decision of Defendant Commissioner of Social Security ("Defendant" or

"Commissioner") finding Copfer disabled after January 2, 2015, but finding Copfer not disabled

during the period April 11, 2012, through January 1, 2015.  Doc. 1, Doc. 15, Tr. 24   Thus, at

issue in this case is the Administrative Law Judge's determination regarding the period April 11,

2012, through January 1, 2015.  Tr. 24.

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the

undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 13.   For the reasons

set forth below, the Court **AFFIRMS** the Commissioner's decision.

## I.  Procedural History

Copfer protectively filed[1] applications for Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI") in September 2013.  Tr. 40, 135, 136.  He alleged a

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about
filing for benefits. It may be used to establish an earlier application date than when we receive your signed
application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 1/28/2019)

disability onset date of February 9, 2009.[2]  Tr. 24, 335, 342, 379.  Copfer alleged disability due

to bipolar disorder, anxiety, depression, tumor in left leg, lipidemia, cellulitis, arthritis in right

leg, ADHD, high cholesterol, and sleep apnea.  Tr. 136-137, 220, 238, 383.  Copfer's

applications were denied initially (Tr. 220-228) and upon reconsideration by the state agency

(Tr. 238-244).   Thereafter, he requested an administrative hearing.  Tr. 250-251.  On September

2, 2015, Administrative Law Judge Susan G. Giuffre ("ALJ") conducted a hearing (Tr. 47-71)

and, on November 12, 2015, the ALJ issued a fully favorable decision, finding Copfer disabled

from April 11, 2012, through the date of the decision (Tr. 191-201).   In its notice dated January

11, 2016, the Appeals Council advised Copfer that it had, on its own, reviewed the ALJ's

November 12, 2015, decision.  Tr. 202-207.  On March 7, 2016, the Appeals Council vacated

and remanded the ALJ's November 12, 2015, decision.  Tr. 208-215.  The basis of the remand

was the need for further development of the date when Copfer required use of a cane for

ambulation.  Tr. 23, 211.  The Appeals Council found that the ALJ had assessed one RFC for the

entire period at issue but that, while Copfer's impairments affected use of his legs prior to 2015,

Copfer did not require use of a cane for ambulation during most of the period at issue.  Tr. 211.


    Following the remand order, on November 1, 2016, the ALJ held a hearing.  Tr. 72-110.

Thereafter, the ALJ issued a partially favorable decision on December 30, 2016.  Tr. 18-46.  In

that decision, the ALJ found Copfer disabled after January 2, 2015, but found him not disabled

---

[2] Copfer filed an earlier application for disability benefits in 2011.  Tr. 114.  That application was denied initially
and on reconsideration.  Tr. 114.  Copfer requested a hearing before an administrative law judge and the hearing was
held in March 2012.  Tr. 23, 114.  That application was denied in a decision dated April 12, 2012 (Tr. 24), which
was affirmed by the Appeals Council in 2013 and later affirmed by the United States District Court in 2014.  Tr. 24,
49. As indicated in the December 30, 2012, Notice of Decision – Partially Favorable (the decision under review by
this Court), due to the decision in the earlier case, the earliest onset date available to Copfer in this case is April 11,
2012.  Tr. 24.  Copfer does not challenge this determination.

prior to January 2, 2015.  Tr. 24.  Copfer requested review of the ALJ's December 30, 2016,

decision by the Appeals Council.  Tr. 333-334.  On November 29, 2017, the Appeals Council

denied Copfer's request for review, making the ALJ's December 30, 2016, decision the final

decision of the Commissioner.  Tr. 1-5.

## II. Evidence[3]

### A.    Personal, vocational and educational evidence

Copfer was born in 1961.  Tr. 136, 335.  He lived with his wife in an apartment.  Tr. 57.

Copfer graduated high school but was in special education classes in school.  Tr. 59, 84.

Copfer's past work included work as a coil winder and general laborer (assembler position).  Tr.

52-53.

### B.    Medical evidence[4]

Treatment notes contain reports indicating that Copfer had a large sarcoma (about the

size of a football) removed from his left thigh in 2007.  Tr. 745, 924, 1055.  After removal of the

tumor, Copfer developed lymphedema in his left lower extremity (Tr. 854, 1055) and a history of

cellulitis in his left lower extremity (Tr. 924, 927, 1031).  Copfer also has a history of right knee

pain.  Tr. 745.

On December 19, 2012, Copfer presented to MetroHealth's urgent care clinic for right

knee pain.  Tr. 745.  Copfer relayed that his pain was worse at the end of the day after he had

been walking around.  Tr. 745.  He denied swelling or locking but had some crepitus.  Tr. 745.

Copfer indicated that he had been using his right knee to compensate for the surgery he

---

[3] Copfer alleged disability based on physical and mental health impairments.  However, the arguments raised in this administrative appeal relate only to the ALJ's consideration of Copfer's physical impairments.  Accordingly, while Copfer's brief contains a section regarding the mental health impairment evidence (Doc. 15, pp. 8-9), the evidence summarized herein generally pertains to Copfer's alleged physical impairments.

[4] Neither parties' statement of facts detail the medical opinion evidence.  Accordingly, that evidence is not included herein.

previously had on his left leg for removal of the sarcoma. Tr. 745. Copfer was not taking over-the-counter medication, using a brace or elevating his leg. Tr. 746. An x-ray of the right knee showed no fracture or dislocation; the joint space was maintained; vascular calcification was seen; and a small joint effusion was noted. Tr. 625. A physical examination on the left revealed lower extremity edema, knee effusion, and no tenderness to palpation. Tr. 747. The physical examination on the right revealed tenderness to palpation on the medial and lateral knee, good flexion, reduced extension to 180 degrees, and no effusion. Tr. 747. Copfer was advised to take Naprosyn, rest, apply ice, and elevate his knee daily. Tr. 747. If his symptoms did not improve in two weeks, he should follow up with orthopedic surgery. Tr. 747.

On January 14, 2013, Copfer saw Dr. Seth Richman, M.D., at MetroHealth for an orthopedic consultation regarding his right knee pain. Tr. 740-742. Dr. Richman noted Copfer's past medical history, including depression, obesity, HLD and a large sarcoma resection from the left thigh in 2007. Tr. 740. Copfer explained that his pain was worse when not moving for a period of time and he felt stiff and it was difficult for him to climb stairs. Tr. 740. Copfer also explained that his knee would painlessly pop from time to time. Tr. 740. He denied any catching or locking of his knee. Tr. 740. Copfer had tried Naprosyn for two weeks without relief. Tr. 741. He felt he was compensating a lot with his right knee because his left knee was weak. Tr. 741. Dr. Richman observed that Copfer walked with a wide shuffle gait, which he felt was likely due to left leg weakness and Copfer's size. Tr. 742. Dr. Richman recommended Aleve or Tyelol for pain, losing weight, a hinge knee brace for support, and physical therapy for strengthening and range of motion. Tr. 742. Dr. Richman also offered Copfer a cane but Copfer declined. Tr. 742. Dr. Richman advised Copfer to follow up in three months if his pain was unresolved or unchanged for probable cortisone injection. Tr. 742.

Copfer started physical therapy on January 17, 2013, and continued with a number of sessions. Tr. 1034-1058. Following the initial evaluation, the therapist concluded that Copfer's prognosis was "poor . . . due to inconsistencies in strength testing, poor effort with exercise, and . . . insist[ence] on disability." Tr. 1056. The therapist felt that Copfer could benefit from range of motion, strengthening of hip, knee, and ankle, flexibility training, gait training with straight cane, and proprioception training. Tr. 1056. During his final physical therapy visit on February 19, 2013, Copfer reported some improvement in his lower extremity pain level with therapy but he had some occasional flare ups. Tr. 1031. Copfer relayed that he had to drive to Kentucky a few days earlier and he was sore and stiff. Tr. 1031. He also reported some intermittent swelling in his left lower extremity. Tr. 1031. The physical therapist's assessment was that Copfer showed some improvement in strength and function but noted that Copfer had been absent from physical therapy and busy with out-of-town family matters. Tr. 1032. Copfer was experiencing a flare up because of his long car trip but overall his pain levels were slightly improved. Tr. 1032. During the session, Copfer exhibited a significant amount of crepitus and gait dysfunction. Tr. 1032. Copfer was independent in his home exercises. Tr. 1032. The therapist indicated that the best course of treatment was "daily consistent home management." Tr. 1031.

In April 2013, Copfer returned to the orthopedic department at MetroHealth for evaluation of right knee pain. Tr. 730. Copfer saw Dr. Christopher Bechtel, M.D. Tr. 730. Dr. Bechtel's assessment was right knee pain and early radiographic signs of osteoarthritis based on prior imaging. Tr. 730. Dr. Bechtel noted that Copfer had completed a course of physical therapy with mild-to-moderate relief but he continued to have pain with activity. Tr. 730. Dr. Bechtel administered a steroid injection to the right knee; he advised Copfer to continue with his

home physical therapy exercises; he stressed the importance of weight loss to help improve his osteoarthritis symptoms; and he advised Copfer to continue Naproxen as needed. Tr. 730.

On May 26, 2013, Copfer was treated at the emergency room with a rash and increased warmth to his left lower extremity. Tr. 849. Copfer was able to move all four extremities, there was no edema and no calf tenderness. Tr. 850-851. Examination of Copfer's left lower extremity revealed no obvious deformity, a well healed wound from the left hip extending down to the knee on the medial aspect; and no drainage, fluctuance, or increased warmth of the healed wound. Tr. 850. On the lower half of the left leg, there were patchy medial areas of erythema and increased warmth from the left knee extending down the left ankle; there was no fluctuance, crepitus, or drainage; distal capillary refill took less than 2 seconds; pulses were 2+ bilaterally; and distal sensation and motor was intact. Tr. 851. Copfer was admitted for further stabilization and evaluation with the impression being left lower extremity cellulitis. Tr. 851. Copfer was discharged with antibiotics and instructions to follow up with his primary care physician in 3-5 days. Tr. 851-852.

On May 31, 2013, Copfer was seen at the urgent care clinic for follow up regarding his left lower extremity cellulitis. Tr. 924-925. When discharged from the emergency room, Copfer had been prescribed a 7-day course of antibiotics. Tr. 924. At his follow-up visit, the physical examination showed minimal erythema, no significant tenderness, and no induration. Tr. 927. An additional dose of antibiotics was prescribed and Copfer was advised to continue using compression stockings/elevation. Tr. 927.

On June 28, 2013, Copfer was treated at the urgent care clinic for an abrasion on his left lower limb. Tr. 933-938. Copfer relayed that he had been injured about a week prior when he was trying to unload building materials off his brother's truck. Tr. 934. He was concerned about

the coloring of the wound and the burning sensation that he was experiencing. Tr. 934. Copfer was prescribed Bactrim for the wound. Tr. 935. Copfer returned to the clinic for follow up regarding his leg wound reporting that he had finished his course of antibiotics but the wound had not changed in size. Tr. 940. The wound was not affecting his mobility. Tr. 940. The treating doctor advised Copfer that it was unlikely that the wound was infected and it could take several weeks for it to heal completely. Tr. 941. He was advised to follow up with his primary care physician. Tr. 941.

On July 31, 2013, Copfer saw Dr. Lewis, his primary care physician, for a routine follow up. Tr. 945. Copfer complained of left shoulder pain. Tr. 945. Dr. Lewis' physical examination of Copfer's extremities showed no lower extremity edema, no cyanosis and extremity strength was normal. Tr. 947. Physical examination of Copfer's left shoulder showed the left shoulder was symmetric without warmth or erythema, no crepitus or effusion, and no range of motion limitations. Tr. 947. Copfer's pain was focused at the acromial head. Tr. 947. Dr. Lewis noted that Copfer's acquired lymphedema of leg was stable and he should continue to use compression hose. Tr. 948. Dr. Lewis indicated that Copfer's shoulder pain was likely acromial bursitis. Tr. 948. Dr. Lewis recommended that Copfer try Mobic since he did not have success with Naproxen and, if his shoulder was not improved at the next visit, they would consider a referral for arthritis/joint injection. Tr. 948.

On August 21, 2013, Copfer saw Dr. Lewis for a non-healing wound on his right shin. Tr. 965. Copfer had dropped a small log on his shin and it scraped his leg. Tr. 965. Dr. Lewis prescribed Bacitracin and recommended that Copfer follow up if the problem did not resolve. Tr. 968.

Physical examination findings from an October 29, 2013, follow-up sleep visit, showed that Copfer had a normal gait and no lower extremity edema, cyanosis, or clubbing. Tr. 978. Copfer was advised to lose weight. Tr. 978. Copfer was not motivated to change his diet and noted physical constraints due to pain. Tr. 978.

Copfer saw Dr. Lewis for a routine follow-up visit on November 20, 2013. Tr. 982-988. Copfer complained of left shoulder pain. Tr. 982. Copfer had not taken the Mobic. Tr. 982. He felt that it did not help. Tr. 982. Copfer indicated he felt his friend's narcotics helped. Tr. 982. Dr. Lewis advised that narcotics were not appropriate. Tr. 982. Copfer had some knee pain but it was stable. Tr. 982. Dr. Lewis' physical examination showed no lower extremity edema or cyanosis and Copfer's extremity strength was 5/5. Tr. 984. Copfer had left shoulder point tenderness. Tr. 984. Dr. Lewis noted that Copfer's acquired lymphedema of leg was stable and he should continue with compression. Tr. 985. Dr. Lewis referred Copfer to physical therapy for his shoulder and prescribed Celebrex. Tr. 985.

During a routine follow-up visit with Dr. Lewis on June 4, 2014, Copfer complained of right knee pain. Tr. 1142. Dr. Lewis noted that a prior x-ray was within normal limits, with the exception of a small effusion. Tr. 1142. Copfer reported that Celebrex had helped but it was hurting his back so he stopped taking it. Tr. 1142. A physical examination of Copfer's extremities showed no lower extremity edema, no cyanosis, and 5/5 strength. Tr. 1144. Dr. Lewis assessed obesity, hyperlipidemia, and osteoarthritis in right knee due to age and body habitus. Tr. 1145. Dr. Lewis noted that Copfer had refused weight management for his obesity. Tr. 1145. Dr. Lewis referred Copfer to physical therapy and prescribed Mobic for his osteoarthritis. Tr. 1145. He advised Copfer to return to see him in three months if the symptoms did not resolve or worsened. Tr. 1145.

Copfer started physical therapy for his osteoarthritis on June 12, 2014. Tr. 1150-1157. He continued with physical therapy through July 17, 2014, attending a total of nine sessions. Tr. 1159-1164, 1165-1170, 1171-1176, 1192-1198, 1199-1205, 1215-1221, 1222-1228, 1235-1241. At the initial visit, Copfer reported being able to drive independently and he was independent with self-care and activities of daily living but he had difficulty with squatting. Tr. 1151. Copfer's knee pain was aching and intermittent and his average pain level was 4/10 and his worse pain level was 6/10. Tr. 1151. The pain level and amount of swelling in his knee varied depending on his level of activity. Tr. 1152. Copfer relayed that his pain increased with climbing stairs, prolonged walking (more than 15 minutes), bending, standing (more than 60 minutes), sitting too long, and transitioning between sitting and standing. Tr. 1152. His pain decreased with medication. Tr. 1152. On physical examination, the therapist observed decreased weight bearing on the left lower extremity; tenderness to palpation at the right diffuse knee; mild edema on the right; sensation intact to light touch in right lower extremity but decreased to light touch on the left lower leg anteriorly. Tr. 1152. Copfer ambulated independently without an assistive device but his gait was antalgic. Tr. 1153. The therapist concluded that Copfer had decreased range of motion, strength, and mobility and pain that limited his ability to function secondary to the underlying condition of osteoarthritis and felt that Copfer would benefit from physical therapy. Tr. 1153.

During his second physical therapy visit on June 17, 2014, Copfer reported that his pain level was a 7/10. Tr. 1159. He relayed that he performed approximately 5 hours of yard work over the weekend and was having some right quad soreness/pain. Tr. 1159. Following the therapy session, Copfer's pain had decreased to 0/10 and he had improved right knee flexion with active range of motion. Tr. 1160. At his third visit, Copfer's reported pain level was 0/10.

Tr. 1165. He relayed that he was feeling much better. Tr. 1165. His walking tolerance was 20 minutes before his left lower extremity became fatigued. Tr. 1165. At his next session on June 24, 2014, Copfer reported that his knee pain was mostly 0/10 but he had been walking very fast the prior day and was having some increased soreness. Tr. 1171. His reported level of knee pain at the visit was 2/10 and remained 2/10 following exercises. Tr. 1172. During a June 27, 2014, session, Copfer's pain level was reported as "just sore to touch." Tr. 1192. He was working on home exercises and doing better. Tr. 1192. The therapist observed mild knee swelling. Tr. 1192. At his July 1, 2014, session, Copfer reported his pain level as "stiff." Tr. 1199. He was working on his home exercises and doing better. Tr. 1199. He was climbing steep stairs at home for exercise. Tr. 1199. The therapist noted bilateral lower extremity fatigue following standing exercises and decreased functional strength in the left lower extremity with stair navigation. Tr. 1201. On July 8, 2014, Copfer's pain level was noted as "just[t] tired." Tr. 1215. He relayed that his legs were sore after doing squats. Tr. 1215. At his July 11, 2014, therapy session, Copfer reported that he was doing pretty good and he was not as tired as the prior session. Tr. 1222. He had been doing his exercises. Tr. 1222. The therapist noted that Copfer continued to have an antalgic gait. Tr. 1224. Also, it was noted that Copfer was continuing to have difficulty with 4" step-down height. Tr. 1224. At his final therapy session on July 17, 2014, Copfer continued to report his pain level as "just tired." Tr. 1235. He was doing his exercises every other day or so and feeling tired out. Tr. 1235. Copfer noted he had been feeling depressed and it was an effort to get through the day. Tr. 1235. The therapist noted that Copfer had not met his goal of decreasing his pain level to 4/10, 100 % of the time, because, after prolonged upright activity, Copfer's pain level was 7-8/10. Tr. 1237. Copfer was still having great difficulty

descending stairs and weakness in hip extensors persisted.  Tr. 1237.  The therapist referred Copfer back to his primary care physician.  Tr. 1237.

During a July 16, 2014, mental health therapy session, Copfer was upset because he and his brother had to push back a project of working on their deck because the power washer they bought did not work.  Tr. 1229, 1243.

On January 2, 2015, Copfer saw Drs. Yazid Hussein, D.O.,[5] and Cheryl Weinstein, M.D., at MetroHealth for bilateral lower extremity pain that he had been having for three to four weeks.  Tr. 1396.  Copfer denied any weakness or paresthesia.  Tr. 1396.  Copfer relayed that his left knee had been giving out on him but he had not had any falls.  Tr. 1396.  Copfer was requesting a cane to help him walk.  Tr. 1396, 1399.  On physical examination, Copfer had good peripheral pulses in his extremities and he had 5/5 strength bilaterally in his lower extremities.  Tr. 1398. Dr. Hussein assessed muscle ache of extremity, noting subjective knee instability; left knee is giving out/no falls/exam not significant.  Tr. 1398.  Dr. Weinstein assessed myalgia bilateral extremities, noting no evidence of recurrence of sarcoma; and knee pain with complaints of unstable gait; acquired lymphedema of leg due to sarcoma surgery; generalized anxiety disorder; and obesity.  Tr. 1399.   Dr. Weinstein noted that Copfer's new leg symptoms seemed to correlate in time with an increase in Copfer's atorvastatin.[6]  Tr. 1399.  Dr. Weinstein decreased his dose of atorvastatin to see if that would help improve his symptoms and she advised him to follow up with his primary care physician.  Tr. 1399.  On physical examination, Dr. Weinstein observed that Copfer's left leg had considerable edema for 1/2 to 1/3 of the lower leg and mild edema inferior to a thigh scar.  Tr. 1399.  Dr. Weinstein noted that Copfer wore elastic support

---

[5] Dr. Hussein was the Resident.  Tr. 1398.

[6] Atorvastatin is the generic name for Lipitor and used to help lower bad cholesterol and raise good cholesterol.  *See* https://www.webmd.com/drugs/2/drug-841/atorvastatin-oral/details (last visited 1/28/2019)

hose. Tr. 1399. Copfer was referred to physical therapy for gait assessment and knee strengthening. Tr. 1398, 1399.

At Copfer's initial physical therapy session on January 8, 2015, (Tr. 1424-1428), Copfer relayed that he was independent with his activities of daily living but he had difficulty with standing, walking, stairs, and squatting (Tr. 1425). The therapist observed that Copfer demonstrated significant lower extremity weakness, decreased bilateral knee range of motion, decreased flexibility, difficulty walking and diminished ability for other functional activities. Tr. 1427. The therapist felt that Copfer's symptoms were consistent with knee degenerative joint disease with pain aggravated by edema. Tr. 1427. Copfer performed gait training with a straight cane and he was issued a cane during his visit. Tr. 1427. The therapist noted that Copfer demonstrated improved gait with use of the cane. Tr. 1427.

**C.      Testimonial evidence**

**1.      Plaintiff**

Copfer testified at and was represented at both the September 2, 2015, hearing (Tr. 51-64) and the November 1, 2016, hearing (Tr. 76-101, 103-104, 105-107).

*September 2, 2015, hearing testimony*

Copfer's problems with his left leg started when he had a sarcoma in his left thigh. Tr. 60. He explained that he had a lymphedema in his left leg and continued to have swelling in his left leg. Tr. 61. To control the swelling, Copfer indicated he wears a compression stocking on his left leg and elevates his left leg at night. Tr. 61. Copfer was not elevating his leg during the day. Tr. 61. Copfer also uses a compression pump on his leg during the day to reduce the swelling. Tr. 61. It is a sleeve that compresses his leg really tight. Tr. 61-62. He has been advised to use it for about an hour and half each day. Tr. 61. Copfer relayed that his legs had

been getting worse. Tr. 53. Copfer attended physical therapy on a number of occasions for his legs. Tr. 53, 63. Copfer indicated that he did not feel that physical therapy really helped. Tr. 54, 56. More recently, per his doctor's referral, he started attending physical therapy in February 2015. Tr. 54. As part of that physical therapy, Copfer started using a cane. Tr. 54. Copfer relayed that he used his cane all the time, even in his house. Tr. 55. Copfer is able to drive himself but his wife usually accompanies him in case he falls, which had happened a couple months prior when his left leg gave out. Tr. 55. Copfer indicated that his leg giving out was one of the main reasons physical therapy provided him with a cane. Tr. 55-56.

Copfer also started having problems with his right knee in 2013. Tr. 62. He has had swelling, osteoarthritis, and a lot of pain. Tr. 62. The problems with his right knee affect his ability to walk. Tr. 63. The cane helps him even out the weight – it helps him with stability. Tr. 63.

When Copfer goes out, he usually is attending a doctor appointment or going to the grocery store. Tr. 56. Copfer indicated it is difficult for him to walk for a long time. Tr. 56. He estimated being able to walk about 10-20 minutes before having to sit down. Tr. 56-57. After that amount of time, Copfer's legs are tired, very sore, aching and hurting. Tr. 57. Resting helps relieve some of his pain. Tr. 57. Copfer usually has to sit for about 15-30 minutes before he starts to feel better. Tr. 57. Copfer's wife was working. Tr. 57. Copfer indicated that, if he was not in too much pain during the day, he tries to clean the apartment a little bit and cook for his wife. Tr. 57. He does some laundry. Tr. 57-58. There is an elevator in Copfer's apartment building which allows him to do some laundry. Tr. 58. Using the stairs is very difficult for Copfer. Tr. 57-58.

*November 1, 2016, hearing testimony*

At the November 1, 2016, hearing, the ALJ noted that the Appeals Council identified a conflict between a statement submitted by Copfer's brother to the Appeals Council, wherein Copfer's brother stated that Copfer did not help him build a deck in 2014 and did not help him unload or load building materials, and Copfer's own reports in his medical records. Tr. 76-77. Those reports indicate that Copfer injured himself while helping his brother load and unload materials in 2013 and helped his brother with a deck in 2014. Tr. 77. Copfer indicated that his brother did not have a deck and he could not explain why the information about building a deck was in his medical records. Tr. 77-78. Copfer also indicated that he never helped his brother with loading of building materials. Tr. 78.

With respect to the Appeals Council notation that the medical records indicated that Copfer was having pain in his right knee because he had stopped taking Celebrex, Copfer explained that he had stopped taking Celebrex because it was causing him pain in his back and kidneys. Tr. 77. His doctors then switched him to another medication for his arthritis. Tr. 78-79. Copfer indicated that the medication he was taking for his arthritis helped a little but his arthritis still bothered him a lot. Tr. 79. His legs hurt really bad all the time and they crack and pop. Tr. 79.

Copfer had his cane with him at the hearing. Tr. 80. He indicated he uses his cane all the time, even in his house. Tr. 80. Copfer stated that the cane helped him with stability. Tr. 80. He explained that his left leg buckles under him without warning. Tr. 80. Copfer stated that he got the cane in 2014. Tr. 81. He indicated that a doctor prescribed the cane for him and then he went to physical therapy to receive instructions on how to use the cane. Tr. 81. Copfer's counsel clarified that the records indicated that Copfer received instructions regarding use of the cane from physical therapy in January 2015. Tr. 81-82 (referencing Exhibit 12F/364 (Tr. 1427)).

Copfer relayed that he had used the cane continuously since he received it.  Tr. 82.  If his leg buckles, the cane provides him with the support needed to catch himself from falling.  Tr. 82.  As a follow-up question, the ALJ asked Copfer whether he had ever fallen before he received the cane and Copfer indicated he had not.  Tr. 82.  Copfer clarified that his leg had buckled under him before getting the cane and he was afraid of falling, which is why he talked with his doctor about getting a cane.  Tr. 83.  He needs to use his cane for support when standing as well as walking because his legs get tired.  Tr. 103-104.  Copfer also received physical therapy in 2013 for the lymphedema in his left leg and in 2014 for problems with his knees.  Tr. 98-99.  Copfer's problems with his legs stared in 2007 when he had a resection of a sarcoma performed.  Tr. 99.  He later developed recurrent cellulitis and lymphedema in his left leg.  Tr. 99.  He was prescribed compression stockings in May of 2013 and uses them every day.  Tr. 99.  Copfer continues to have swelling even with use of the compression stockings.  Tr. 99.  Copfer elevates his leg at night when he sleeps and, on some days, he needs to elevate his leg during the day for four or five hours over the course of the day.  Tr. 100, 105-106.  Copfer indicated that excessive activity and standing makes the swelling in his leg worse.  Tr. 100.  Copfer started elevating his leg following his surgery in 2007.  Tr. 106.  Copfer indicated that his doctors have explained to him that the swelling in his leg occurs because, when the doctors removed the sarcoma, a lot of nerve endings and lymph nodes were cut out so there are less pathways through which fluids can circulate.  Tr. 101.

During a typical day, Copfer will get up and take his wife to work.  Tr. 89.  He will return home and, if his depression is bothering him, he will lie down and sleep for most of the day.  Tr. 90.  He might watch television or use the computer a little.  Tr. 91.  He picks his wife up from work and his wife will prepare dinner for them.  Tr. 90.  During the day, he does some chores,

like dishes if there are any from breakfast or dinner but his wife performs most of the household chores or they work on them together. Tr. 90. Copfer cannot manage stairs well so he and his wife needed to find an apartment with an elevator, which took them a while to do. Tr. 90-91.

## 2. Vocational Experts

Vocational Expert Gail Klier ("VE Klier") testified at the September 2, 2015, hearing. Tr. 64-69. VE Klier agreed that Copfer's past work included coil winder and general laborer, as characterized by a prior VE and identified by the ALJ earlier in the hearing. Tr. 52-53, 65.

Vocational Expert Gene Burkhammer ("VE Burkhammer") testified at the November 1, 2016, hearing. Tr. 101-108. The ALJ advised VE Burkhammer that the past relevant work of coil winder and general laborer (assembler) was being adopted from an earlier decision. Tr. 76. Copfer's counsel noted her understanding with respect to the ALJ's adoption of the previously described past relevant work. Tr. 76. The VE indicated that coil winder was an SVP 4[7] light job, and production assembler was an SVP 3 light job that was performed by Copfer at the medium level. Tr. 103. The ALJ asked the VE whether an individual of Copfer's age, with the same education and past relevant work and with the RFC for light work who could climb ramps and stairs occasionally; never climb ladders, ropes and scaffolds; could stoop, kneel, crouch, and crawl occasionally; and could perform simple routine tasks in a work setting without frequent changes or fast pace requirements, which involves only superficial interaction would be able to perform Copfer's past relevant work. Tr. 104. The VE indicated that the individual would not be able to perform Copfer's past work but there would be light, SVP 2 jobs available, including

---

[7] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 WL 1898704, *3 (Dec. 4, 2000). "Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT." *Id.*

(1) housekeeping cleaner; (2) mail clerk; and (3) clerical assistant.  Tr. 104-105.  The VE

provided national job incidence numbers for each of the identified positions.  Tr. 105.   The ALJ

then asked the VE whether adding to the hypothetical a requirement that the individual needed a

cane for walking and standing and a requirement that the individual be able to elevate the left

lower extremity above waist level throughout the day for four or five hours but not continuous

hours, just periodically, would change his testimony.  Tr. 105-106.  The VE replied, "That would

reduce the level to sedentary then the need to elevate for that length of time throughout the day

would eliminate all work."  Tr. 106.  Copfer's counsel asked the VE to consider the first

hypothetical but, instead of requiring use of a cane, the individual would require the ability to

take approximately four breaks, beyond those normally allowed, lasting 15 minutes to get off the

leg due to problems with pain, weakness and swelling.  Tr. 108.  The VE explained that such a

limitation would eliminate all work in the economy.  Tr. 108.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the

existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in the
> national economy[8] . . . .

---

[8] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the
region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[9] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[10] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

---

[9] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

[10] The DIB and SSI regulations cited herein are generally identical. Accordingly, in some instances herein, for convenience, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In her December 30, 2016, decision, the ALJ made the following findings:[11]

1.　　Copfer met the insured status requirements through June 30, 2014. Tr. 27.

2.　　Copfer had not engaged in substantial gainful activity since the alleged onset date of April 11, 2012. Tr. 27.

3.　　Since April 11, 2012, Copfer had the following severe impairments: radical resection of left leg sarcoma, acquired lymphedema of the left leg, osteoarthritis of the right knee, obesity, obstructive sleep apnea, depression, anxiety, and learning disorder. Tr. 27.

4.　　Since April 11, 2012, Copfer did not have an impairment or combination of impairments that met or medically equaled the severity of a Listing. Tr. 27-28.

5.　　Prior to January 2, 2015, the date Copfer became disabled, Copfer had the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) except he could climb ramps and stairs occasionally; climb ropes, ladders, and scaffolds never; could stoop, kneel, crouch, crawl occasionally; and had the ability to perform simple routine tasks in a work setting without frequent changes and fast-paced requirements, involving only superficial interactions. Tr. 29-34.

6.　　Beginning on January 2, 2015, Copfer had the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) except could climb ropes, ladders and scaffolds never; could stoop, kneel, crouch, crawl occasionally; had the ability to perform simple routine tasks in a work setting without frequent changes and fast-paced requirements, involving only superficial interactions; required use of a cane for walking and standing; needed to elevate left lower extremity above waist level throughout the daytime for 4-5 hours, but not continuous hours, just periodically. Tr. 34-37.

7.　　Since April 11, 2012, Copfer had been unable to perform any past relevant work. Tr. 37.

8.　　Prior to the established disability onset date, Copfer was a younger individual age 18-49. Since the established disability onset date, Copfer's

---

[11] The ALJ's findings are summarized.

age category changed to an individual closely approaching advanced age. Tr. 37.

9.      Copfer had at least a high school education and was able to communicate in English. Tr. 37.

10.      Prior to January 2, 2015, transferability of job skills was not material to the determination of disability. Tr. 37-38. Beginning on January 2, 2015, Copfer had not been able to transfer job skills to other occupations. Tr. 37-38.

11.      Prior to January 2, 2015, considering Copfer's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Copfer could have performed, including housekeeping/cleaner, mail clerk, and clerical assistant. Tr. 38.

12.      Beginning on January 2, 2015, considering Copfer's age, education, work experience, and RFC, there were no jobs that existed in significant numbers in the national economy that Copfer could perform. Tr. 38-39.

13.      Copfer was not disabled prior to January 2, 2015, but became disabled on that date and continued to be disabled through the date of the decision. Tr. 39.

14.      Copfer was not under a disability within the meaning of the Social Security Act at any time through June 30, 2014, the date last insured. Tr. 39.

## V. Plaintiff's Arguments

Copfer argues that the ALJ erred by excluding from the RFC for the period prior to January 2, 2015, the requirement that Copfer needed to "elevate the left lower extremity above waist level throughout the daytime for 4 to 5 hours, but not continuous hours, just periodically." Doc. 15, p. 11 (quoting Tr. 34). Copfer also argues that the ALJ erred by finding that Copfer did not have a medical need to use a cane for ambulation prior to January 2, 2015. Doc. 15, pp. 13-15.

## VI. Law & Analysis

### A.     Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court may not overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.     Copfer has not shown error with respect to the ALJ's RFC for the period prior to January 2, 2015**

Copfer challenges the ALJ's RFC assessment for the period prior to January 2, 2015.  He contends that the ALJ should not have excluded from the RFC for the period prior to January 2, 2015, the requirement that Copfer needed to "elevate the left lower extremity above waist level throughout the daytime for 4 to 5 hours, but not continuous hours, just periodically."  Doc. 15, p. 11 (quoting Tr. 34).  He also argues that the ALJ erred by finding that Copfer did not have a medical need to use a cane for ambulation prior to January 2, 2015.  Doc. 15, pp. 13-15.

The Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record. 20 C.F.R. §§ 404.1545(a)(3), 404.1546(c).

### 1. Need to elevate leg

Copfer argues that the ALJ erred by excluding from the RFC for the period prior to January 2, 2015, the requirement that Copfer needed to "elevate the left lower extremity above waist level throughout the daytime for 4 to 5 hours, but not continuous hours, just periodically." Doc. 15, p. 11 (quoting Tr. 34). This requirement was included in the RFC for the period beginning on January 2, 2015, and Copfer argues that it should have also been included in the RFC for the period prior to January 2, 2015, because his edema was present throughout the record and persisted despite the use of compression hose even prior to January 2, 2015.

In advancing his argument, Copfer contends that the ALJ ignored evidence of the continuing nature of the condition and, therefore, the decision was not based on the entirety of the record. Doc. 15, pp. 11-12. The Court finds that the ALJ did not ignore evidence. In formulating the RFC for the period prior to January 2, 2015, the ALJ considered evidence of edema and recommendations that he use compression stockings and elevate his leg. Tr. 30. Additionally, the ALJ considered other evidence, including evidence showing that, during the period prior to January 2, 2015, Copfer had a robust range of activities of daily living, including working on a deck. Tr. 31, 34. While Copfer disputed the medical records reflecting more robust activities than Copfer alleged he was able to perform (Tr. 76-78), in this appeal, Copfer has not shown that the ALJ's findings with respect to his activities of daily living during the period prior to January 2, 2015, are not supported by substantial evidence. The ALJ also considered physical therapy records and other evidence of record. Tr. 30-34.

In connection with her assessment of the RFC for the period starting on January 2, 2015, Copfer points out that the ALJ stated "Moreover, the claimant has an edema throughout the record which persists despite compression house [sic].  It is reasonable to allow him to elevate his leg[,]"  Doc. 15, p. 12 (citing Tr. 35).   In light of this statement, Copfer contends that the need for Copfer to elevate his left lower extremity must be applied to the entire alleged disability period.  Doc. 15, p. 12.  However, Copfer has not demonstrated why this statement, which was made in the context of assessing his RFC for the period starting on January 2, 2015, supports the same RFC limitation for the period prior to January 2, 2015.

When assessing the RFC for the period starting on January 2, 2015, the ALJ took into account evidence from a January 2, 2015, medical treatment record, which shows that Copfer had considerable lymphedema on one-half to one-third of the lower extremity despite the fact that he was wearing compression hose.  Tr. 34.  Also, it was at this visit that Copfer, who had declined a cane in the past (Tr. 742), requested a cane (Tr. 34, 1396, 1399).   This evidence does not relate to the pre-January 2, 2015, period and Copfer has not shown that the RFC for the period prior to January 2, 2015, is not supported by substantial evidence.  As indicated above, the ALJ considered evidence of edema prior to January 2, 2015, along with other evidence of record, including robust activities of daily living.

Considering the foregoing, the Court finds that Copfer has not shown that the ALJ erred by not including an elevation requirement in the RFC for the period prior to January 2, 2015.  Further, Copfer's claim that the ALJ ignored evidence that he had edema and used compression stocking and elevation to relieve his symptoms prior to January 2, 2015, is unfounded and amounts to a request that this Court try the case *de novo*, which is not the Court's role.  *Garner*,

745 F.2d at 387 (A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility.").

### 2. Need to use cane for ambulation

Copfer argues that the ALJ erred by finding that Copfer did not have a medical need to use a cane for ambulation prior to January 2, 2015. Doc. 15, pp. 13-15. He contends that a medical treatment record from January 14, 2013, supports a finding that he required use of a cane for ambulation prior to January 2, 2015. *Id.* The medical record relied upon is a treatment note from a visit with Dr. Seth Richman, MD, in the orthopedic department at MetroHealth. Doc. 15, p. 13 (referring to Tr. 740-742). In that treatment note Dr. Richman indicated that Copfer was offered, but declined, a cane. Tr. 742. Copfer contends that this treatment note should have been treated as a treating physician opinion and assigned controlling weight. Doc. 15, pp. 14-15.

Copfer's reliance on the January 14, 2013, treatment note to show that he required a cane prior to January 2, 2015, is wholly misplaced. First, he <u>declined</u> use of a cane (Tr. 742) and acknowledges that he did not begin using an ambulatory aid in January 2013 (Doc. 15, p. 13). Yet, he now attempts to claim he needed a cane at that time. Second, Copfer's argument that the treatment record amounts to a medical opinion indicating that a cane was medically necessary prior to January 2, 2015, is unpersuasive. Dr. Richman did not prescribe a cane. He noted only that a cane was offered and Copfer declined it. Tr. 742. Third, Copfer's claim that Dr. Richman was a treating physician is unsupported by the record. The record does not demonstrate an ongoing treatment relationship between Dr. Richman and Copfer. The January 14, 2013, visit was a "new patient" visit with Dr. Richman, an orthopedic surgeon, for assessment of Copfer's knee pain. Tr. 740, 742. And Copfer acknowledges that Dr. Richman was new to treating him at the time the record was made. Doc. 15, p. 14. Since there was no ongoing treatment

relationship, even if deemed a medical opinion, Dr. Richman's treatment note would not be entitled to deference or controlling weight under the treating physician rule. *See Kornecky v. Comm'r of Soc. Sec*, 167 Fed. Appx. 496, 508 (6th Cir. 2006)*; Daniels v. Comm'r of Soc. Sec.,* 152 Fed. Appx. 485, 490 (6th Cir. 2005).

For the foregoing reasons, the Court finds Copfer has not shown error with respect to the ALJ's decision not to include in the RFC for the period prior to January 2, 2015, a requirement that Copfer must use a cane.

## VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated: January 28, 2019

*/s/ Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge